IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SEO JEONG WON, also known as JASMINE SEO, and PARK YOUNG JA,<br><br>Plaintiff,<br><br>vs.<br><br>RAYMOND ENGLAND; JOSEPH SWEENEY, AND USA FEDERAL CREDIT UNION<br><br>Defendant. | CIVIL NO. 07-00606 JMS-LEK<br><br>Honolulu, Hawaii<br>May 15, 2009<br>9:02 a.m.<br><br>Intervenor Seo Kyoung Won's Motion to Intervene as Co-Plaintiff |
| RAYMOND ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>USA FEDERAL CREDIT UNION,<br><br>Defendant. | CIVIL NO. 08-00158JMS-LEK |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: TED PETTIT
Case Lombardi & Pettit
737 Bishop Street, Suite 2600
Pacific Guardian Ctr. Mauka Tower
Honolulu, Hawaii 96813

APPEARANCES:
(CONTINUED)

For the Intervenor-Plaintiff Seo Kyoung Won:
FRANCIS P. HOGAN
MICHAEL R. VIEIRA
Ashford & Wriston
A Limited Liability Law Partnership
1099 Alakea Street, Ste. 1400
Honolulu, Hawaii 96813

For the Defendant Raymond L. England:
WILLIAM M. HARSTAD
Carlsmith Ball, LLP
1001 Bishop Street, Suite 2200
Honolulu, Hawaii 96813

J. BROCK McCLANE
215 E. Livingston Street
Orlando, Florida 32801

Official Court Reporter:
GLORIA T. BEDIAMOL, RPR, RMR
United States District Court
P.O. Box 50131
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

I N D E X


| WITNESSES: | PAGE NO. |
|---|---|
| SEO KYOUNG WON | |
| DIRECT EXAMINATION BY MR. HOGAN | 9 |
| CROSS-EXAMINATION BY MR. McCLANE | 17 |

Friday, May 15, 2009 9:02 a.m.

THE CLERK: Civil number 07-00606JMS-LEK and Civil Number 08-00158 JMS-LEK. This is Seo Jeong Won versus Raymond England and Raymond England versus USA Federal Credit Union.

Counsel, your appearances for the record.

THE COURT: Stand up, sir. Stand up.

THE CLERK: This is a motion to intervene.

MR. HOGAN: Good morning, Your Honor, Francis Hogan for the movant for intervention. With me is the movant Seo Kyoung Won and also with us is Esther Cho to provide translation services; she's been sworn. And with me is my associate Michael Vieira.

THE COURT: All right. Yes. Good morning to all of you.

MR. PETTIT: Good morning, Your Honor, Ted Pettit appearing for plaintiff Seo Jeong Won also known as Jasmine Won.

Your Honor, I want advise the court now that the probate court has approved the sister, Kyoung's, petition to represent the probate estate. So I'm not entering an appearance at this time for Ms. Seo as personal representative of Mrs. Park's estate.

THE COURT: All right. You are just here on her behalf as a plaintiff?

MR. PETTIT: Correct.

THE COURT: Okay. Is she prosecuting this case any further as a plaintiff?

MR. PETTIT: Well, she hasn't -- none of her claims have been dismissed.

THE COURT: Well, no, is she participating in this case, Mr. Pettit?

MR. PETTIT: Yes.

THE COURT: Do I have any proof of that whatsoever? Where is she? I told everyone to be here today. Where is she?

MR. PETTIT: She is in Seoul, Korea, to the best of my knowledge, Your Honor.

THE COURT: Did you tell her to be here?

MR. PETTIT: Yes, I did.

THE COURT: Did she come?

MR. PETTIT: No.

THE COURT: All right. Thank you, you may be seated.

MR. McCLANE: Your Honor, Brock McClane, I'm representing Raymond England, and I'm here from Orlando, Florida pro hac vice, and I appreciate the court allowing me to appear today.

THE COURT: All right.

MR. HARSTAD: William Harstad for Raymond England.

THE COURT: All right. Good morning to both of you as well. You all may be seated. Thank you.

All right. I got an e-mail from Magistrate Judge

Kobayashi yesterday. Apparently you folks made some headway, but didn't quite get to where you need to get to settle the case.

So I think what we need to do then, Mr. Hogan, is take up your motion first.

MR. HOGAN: Thank you, Your Honor. Before I proceed, I advise the court that we did file what we called a reply memorandum on --

THE COURT: More of an update almost than a reply?

MR. HOGAN: Yes. An update that addressed the status of the probate case. And to be more clear about that, we're just caught in Judge Hirai's requirement that approval as to form be attempted before she reviews the order for signing and filing.

It is in the hands of Mr. Kanemitsu, the other probate attorney for Seo Jeong Won. We didn't have it back yet, and I'm confident that as of today it has not yet been filed; but the petition itself was not opposed. The petition was granted as the minutes reflect, and it's just a matter of documenting that ruling by Judge Hirai.

That said, what we have also provided the court in the reply memo is an affidavit -- actually two affidavits of my client, Seo Kyoung Won, attesting that she did not sign the release and waiver, that she did not sign the renunciation, and that the signatures on those two documents were not hers.

We had set aside this time for an evidentiary hearing anticipating that there would be issues of fact that needed to be addressed by this court on the record. There being a statement of no opposition from the credit union, a statement of no position from Mr. England, and no response from the plaintiff Seo Jeong Won, we ask the court whether further evidence need be taken.

I would simply be essentially repeating what is in the affidavit that was attached to the reply memo.

THE COURT: All right. Well, let's hear from Mr. Pettit and what his position is on this.

MR. PETTIT: Thank you, Your Honor. I did not have any specific instructions from my client with regard to the motion. I think we have no position is probably the way to say it.

THE COURT: All right. Do you have any interest in cross-examining Ms. Seo Kyoung Won based on the affidavit she submitted?

MR. PETTIT: No, I do not.

THE COURT: All right. Mr. McClane.

MR. McCLANE: Yes, Your Honor. We filed a statement of no position, but I believe that we are still concerned that the party be appropriate in this case. And I do have an interest in any brief cross-examination of Ms. Kyoung.

THE COURT: On what area do you want to go?

MR. McCLANE: The area of her knowledge of the statement that she has filed. She has filed statements to the court and the probate that are looked at contradictory with what we know to be the case.

And it's our understanding that there's litigation in Korea surrounding wills. It's our understanding that there's a will being probated in Korea. And it's our understanding that newspapers -- we've got documents that have been filed indicating that newspapers have documented --

THE COURT: Okay, but you filed -- I don't understand you in a lot of respects, Mr. McClane. You file a statement of no position, but you apparently want to take a position here.

MR. McCLANE: I would like to just test the appropriateness of Ms. Kyoung --

THE COURT: But isn't that taking a position?

MR. McCLANE: After I cross-examine her, perhaps I might have a position.

THE COURT: So your statement of no position you're withdrawing?

MR. McCLANE: Well, if I need to or else I would reserve until after I've taken a cross-examination, if I may.

THE COURT: All right. So, Mr. Hogan, why don't you put her on the stand. What we can do is have her affirm, if you wish, some of the declaration that she's submitted, and then we'll allow cross-examination.

MR. HOGAN: Thank you, Your Honor.

SEO KYOUNG WON WAS SWORN

THE COURT: Mr. Hogan, what I have, as far as documentation, is your reply memorandum; so you could refer perhaps to the exhibits in that reply memorandum.

MR. HOGAN: Thank you, Your Honor.

THE CLERK: She needs to state her name for the record.

THE WITNESS: Kyoung Won Seo, K-Y-O-N-G, W-O-N, S-E-O.

MR. HOGAN: Your Honor, Ms. Cho has been sworn by the courtroom manager. Is there any need for further qualification of her to provide interpreting services?

THE COURT: Does anyone have questions regarding the qualification of the interpreter?

MR. McCLANE: No, Your Honor.

MR. PETTIT: No questions, Your Honor.

THE COURT: All right. You may proceed. And I should say I'm familiar with Ms. Cho and know of her qualifications, and she is qualified.

MR. HOGAN: I understood that, Your Honor.

DIRECT EXAMINATION

BY MR. HOGAN:

Q Good morning, Kyoung Won.

A Good morning.

Q Would you --

THE COURT: Let me stop you, Mr. Hogan. It's clear to me she speaks some English, and I don't like having part English and part foreign language, okay? So I will leave it up to you if she believes she can testify in English and use the interpreter as an aid if necessary to consult; but otherwise, she should allow the interpreter to interpret into Korean, answer in Korean, and then have the interpreter answer in English.

How do you want to proceed?

MR. HOGAN: We're going to proceed that way to make sure the record is clear.

BY MR. HOGAN:

Q Kyoung Won, would you tell the court your age and where you live?

A I'm 37 years old. I live in Seoul, Korea.

MR. HOGAN: Your Honor, I beg the court indulgence, just a few questions foundational to establish who this person is.

THE COURT: You certainly may.

MR. HOGAN: Thank you, Your Honor.

BY MR. HOGAN:

Q Are you married, and do you have any children?

A I'm married, and I have two children.

Q I understand you have two boys?

A Yes, that is correct.

Q Can you tell us what your education background is?
A I have a bachelor's degree. I majored in economy.
Q And you are presently employed, correct?
A Yes, I have a job.
Q With whom do you work, and what is your position?
A I work at a Korean bank, and I'm assistant manager.
Q Your sister is Jeong Won, correct?
A Correct.
Q Can you tell us how old your sister is?
A She's 41 by American standard.
Q Did your sister also get a degree from the university?
A Yes.
Q What degree?
A Administration.
Q Is it the same level as your degree or a higher level?
A She finished graduate school.
Q Now, this is sensitive, and I understand it, your mother died in April of 2008, correct?
A Yes.
Q Was she married when she died?
A No.
Q She was divorced in 1980; is that correct?
A Yes, that is correct.
Q At the time she died, what real estate did you then know your mother owned?

A Do I have to mention the address of the location?
Q The town is enough.
A At that time she passed away, she owned the land situated at Kayang-Dong Seoul.
Q Do you know of any other real estate she owned?
A As far as I could verify, that was the extent of her real estate ownership.
Q You and your sister handled your mother's estate in Korea, correct?
A Yes, that is correct.
Q You each had a lawyer representing you, correct?
A That is correct.
Q And that the property in Korea was disposed of without any disagreement between you and your sister, correct?
A That is correct.
Q When did you first learn about the legal case in Hawaii?
A It was February 13, 2009 by Korean date.
Q Yes. And how did you learn?
A I received a document through mail from someone named Kanemitsu, or something, my sister's lawyer apparently, and then I was required to sign and return that document.
Q Before then, did you know that your sister had filed a document to probate your mother's estate in Hawaii?
A I did not have any knowledge of that at all.
Q Before then, did you have any knowledge of this lawsuit in

this court?
A Not at all.
Q Now, we talked about the real property in Korea. I have a couple more questions about that. That property was covered by a will, correct?
A Only for the real property, yes.
Q Thank you. And the real property, the will only addressed a half interest in the real property, correct?
A That is correct.
Q And the other half interest in the property went to you and your sister outside the will, correct?
A That is according to Korean estate law.
Q Thank you. And that -- as you said, that was all handled with the lawyers for you and your sister, correct?
A Yes, that's correct -- just a minute. As far as the division of the real property, my sister's lawyer assisted us.
MR. HOGAN: Thank you.
Your Honor, while I have her on the stand, I guess I might as well reaffirm the statements in her declaration which she signed.
THE COURT: Yes.
MR. HOGAN: May I approach?
THE COURT: You may.
MR. HOGAN: She doesn't have a copy.
THE COURT: You may. Do you want to mark that as an

exhibit for the hearing, or is it an exhibit to the reply that --

MR. HOGAN: They are exhibits to the reply, and I will identify them as such.

THE COURT: Is that satisfactory to everybody, just referring to them as the exhibits in the response?

MR. PETTIT: It is, Your Honor.

MR. McCLANE: Yes, Your Honor.

THE COURT: Just for the purposes of the record. What exhibit are we talking about?

MR. HOGAN: Your Honor, I've handed the witness Exhibits G and H. For the record, Exhibit G is a document entitled Release, Waiver and Assignment, Exhibit H is a document entitled Renunciation of Right to Appointment and Nomination of Personal Representative.

THE COURT: All right. And just so the record is clear, this is exhibits to document 158, your reply memorandum in support of the motion to intervene as co-plaintiff.

MR. HOGAN: Thank you, Your Honor.

THE COURT: All right.

BY MR. HOGAN:

Q Kyoung Won, if you would look at Exhibit G. Is that your signature on Exhibit G?

A No, it is not.

Q If you would look at Exhibit H, is that your signature on

Exhibit H?
A No.
THE COURT: When is the first time you saw either of those exhibits?
THE WITNESS: As far as this Exhibit H is concerned, I received that through the mail on February 13. And as for this G, during sometime in March I received through law office of Mr. Hogan.
THE COURT: March of this year?
THE WITNESS: Yes.
THE COURT: All right. Thank you.
MR. HOGAN: Thank you, Your Honor.
Q Kyoung Won, on Exhibit G there is a stamp next to the signature. Is that your stamp?
A Yes, it is mine.
Q Do you have a recollection of giving your stamp to your sister?
A Yes, I gave it to her.
Q And what did you understand was the reason you gave her your stamp?
A My sister explained to me that in order to sell the property they inherited, she needed this seal for the interested buyer.
MR. HOGAN: Thank you.
Your Honor, to close the loop, I would like to show

the witness Exhibits J and K from the reply memoranda.
THE COURT: All right. You may approach if you need to.
BY MR. HOGAN:
Q Thank you. Kyoung Won, do you recognize what Exhibit J is?
A Yes, I do.
Q Is that your passport?
A Yes, it is.
Q Is that your signature on the passport?
A Yes, that is correct.
Q If you would look at the other exhibit in front of you --
THE COURT: Which is K for the record?
MR. HOGAN: Which is K, Your Honor.
Q Kyoung Won, there are two affidavits in this exhibit. Would you look at the signature pages? Are those your signatures on those pages?
A Yes, it is.
Q Okay. Has your signature always, in the last five years, taken that form?
A Not so. Not so.
Q When you sign formal documents, is that the signature that you use?
A Yes.
MR. HOGAN: Nothing further, Your Honor.

THE COURT: All right Mr. McClane, cross.

CROSS-EXAMINATION

BY MR. McCLANE:

Q Good afternoon, Ms. Kyoung. Just a few questions relating to your knowledge of your mother's estate. You mentioned a will that was -- or an estate that was probated in Korea?

A Yes.

Q And with regard to the portion of the real estate that you described, that was to be left to someone, other than your sister and yourself, a half interest?

A That is correct.

Q Who was that beneficiary?

A My niece, and that she's my sister's daughter.

Q And that --

A Daughter.

Q Thank you. That was pursuant to a testamentary instrument or will; is that correct?

A It was designated to my niece, just a half of it.

Q Pursuant to a will?

A Yes.

MR. McCLANE: Your Honor, may I approach with the document relating to the will?

THE COURT: Do you have a copy for me?

MR. McCLANE: Yes.

THE COURT: Do you have a copy for opposing counsel.

MR. McCLANE: Yes.

THE CLERK: Do you have an extra copy for the law clerk too?

THE COURT: You are out? All right.

MR. McCLANE: May I approach the witness?

THE COURT: You may.

BY MR. McCLANE:

Q Shall I call you Ms. Kyoung?

A It doesn't matter one way or another.

Q Ms. Kyoung I have a document here --

THE COURT: I want you to hand it to her and then go back to the microphone so the court reporter can pick you up.

Q Ms. Kyoung, just take a moment to review that document for me, if you would. That document is entitled Notarial Certificate. Can you describe what it is a notarial certificate of, it's largely in Korean?

THE COURT: Are you familiar with this document, ma'am?

THE WITNESS: Are you referring to this Korean form?

Q My understanding is that the Korean and the English are copies of each other.

A This document, as I understand it, is someone who was not entitled to find -- to find something to get it, and it was denied. That's my understanding.

MR. HOGAN: Your Honor, at this time I object on the

basis that there's a lack of foundation for the document.

THE COURT: Well, it hasn't been -- there's been no effort to introduce it yet; so it's not been introduced. There is a lack of foundation right now to introduce it.

MR. McCLANE: I understand, Your Honor. I haven't tried to introduce it and probably will not.

Q Ms. Kyoung, does that document relate in any way to the will that we were just discussing?

THE COURT: Well, let me stop you. Here's the problem I think Mr. Hogan is raising, and what he is raising is there's no evidence that she is in a position to testify regarding this document.

In other words, you have not laid a foundation that you can ask questions about the meaning of the document. Because it's meaningless for her just to read something that she doesn't know what it is. Because I don't know what it is, and you don't have any other means to introduce this that I know of at least.

MR. McCLANE: She's not going to be able to authenticate it, Your Honor, I understand that, because she doesn't know where it came from. But I think she can read it better than we can.

THE COURT: Well, but just reading a document that's not going to be introduced is meaningless. It doesn't mean anything to me and can't be used in court here.

MR. McCLANE: Fair enough, Your Honor.

THE COURT: So I don't know if she's ever seen this document before or if she has knowledge of it or anything of that sort.

MR. McCLANE: Well, I'm not intending to introduce it as evidence, Your Honor. I'm merely showing it to her to confirm that it is related to that will, and that we're tying together what she was just talking about, which is that there was a will related to real property, and I'll move on.

THE COURT: But she can't do that if she doesn't know what this is. In other words, she can say that's what it says. But anyone can create a document and give it to a witness, and the witness can say here's what the document says.

MR. McCLANE: Fair enough, Your Honor. I'll move on to my next point. She's established that there was a will related to real estate; that is the first will that we're talking about.

Q Ms. Kyoung, I'm not sure if this is what you testified to before, because I couldn't see you speaking or your translator. Was there another will involved in the other probate proceeding that you described involving your sister?

A No.

Q You and your sister had litigation though relating to your mother's estate?

A Not at all.

Q You are aware, Ms. Kyoung, aren't you, of a will that was changed to name you and your sister as beneficiaries at some point in history, a will besides the one that was disposing of the half interest in real estate?

THE COURT: Ma'am, let me stop you. You need to look at the interpreter to answer.

THE WITNESS: There is a different translation and change. When first the will was drafted, that was year of 2005. According to that will, the half portion would go to my niece and the half goes to my mother's brother. But in March 2008, my mom cancelled that inheritance that would go to my -- her brother.

In Korea, even the certain portion is cancelled in the will, the older -- the heirs are entitled to that cancelled portion of the estate. The crucial point is it was not designated -- the half portion was not designated to my older sister and me, but it was cancelled.

Q And it's your testimony today that that was in March of 2008 that your mother cancelled that will?

A Yes.

Q And what was the date of your mother's death?

A April 3, 2008.

Q Are you aware of how the will was cancelled?

A I found this out after my mother's passing about whether she even had that will and that there was some cancellation.

Q Did you actually receive a portion of her estate pursuant to the cancellation or pursuant to your rights that arose from the cancellation of that will?
A Yes.
Q Did you question ever the circumstances of the cancellation of the will?
A I had no one to question because my mom had already passed away.
Q Was there any dispute with any other family members related to the cancellation of the will?
A No, no one said they knew about it.
Q So it's your testimony -- well, let me ask you, were there any other wills, that you're aware of, relating to your mother's estate?
A As far as I know, no.
Q Are you aware that the proposed order in the probate case has the court finding that your mother's -- that your mother died intestate, meaning, without a will at all?
A Are you referring to some document that my older sister filed?
Q No, I'm referring to a document that your lawyer filed and has asked the court to enter, and I believe that's what the document that we're thinking is going to be entered.
A The reason I indicated such is that only the limited to the real property there was a will.

THE INTERPRETER: I lost some portion she has to repeat.

THE WITNESS: The reason I indicate that was that that particular will was nothing to do with this case.

Q But you would agree with me that it's not true that your mother died intestate or without a will, correct?

MR. HOGAN: Objection, Your Honor, calls for a legal conclusion.

THE COURT: She can answer as to her understanding.

THE WITNESS: There was a will.

THE COURT: Anything further?

MR. McCLANE: I do, Your Honor. I would like to ask about some of her knowledge regarding the amended complaint, if I may.

THE INTERPRETER: Your Honor, she wants to finish -- complete her response.

THE COURT: She may.

THE WITNESS: There are some differences as far as the laws are concerned between United States and Korea. In Korea, when certain thing is specified in the will, that is of course affected. It's not because I didn't want to disclose anything for me to say that she died without any will. What I had in my mind was my concept of Korean law regarding the will, and I thought that was nothing to do with this case.

THE COURT: Mr. McClane, what are you going into now?

Q Thank you. Yes. Ms. Kyoung, have you read the document that's called the Second Amended Complaint in this case?

MR. HOGAN: Your Honor, may I ask for a foundation for the relevance of this line of inquiry?

THE COURT: Yes, what is the relevance of this?

MR. HOGAN: This is the motion to intervene.

MR. McCLANE: She's filed a motion to intervene and has incorporated all of these allegations into her motion to intervene.

THE COURT: I'm not going to let you start to question her about her allegations here, if that's what your intending to do, the allegations in the --

MR. McCLANE: Then I have no further questions.

THE COURT: All right.

Mr. Hogan, anything further?

MR. HOGAN: No, Your Honor.

THE COURT: Mr. Pettit, do you have anything?

MR. PETTIT: Nothing further, Your Honor.

THE COURT: Thank you, ma'am. You may step down. Arguments.

MR. HOGAN: Thank you, Your Honor. We have, I understood, two motions relating to the same thing that have not been decided: A motion for substitution of party filed by plaintiff Seo Jeong Won seeking to have the personal representative of the estate substituted for Mrs. Park. At

that time, Seo Jeong Won had an appointment under an informal probate as a personal representative.

THE COURT: That motion has been withdrawn is my understanding.

MR. PETTIT: That's correct, Your Honor, the court withdrew that motion last month I believe.

THE COURT: Right. With leave for you to refile based on all of the new allegations that were surrounding this matter.

MR. PETTIT: Exactly. Thank you, Your Honor.

THE COURT: And that was not done.

MR. HOGAN: Thank you, Your Honor. Then this is the motion to intervene.

The record is unambiguous that Seo Kyoung Won has filed and proved, without opposition or objection, in the probate court to the satisfaction of the probate court that she is an heir and qualified to serve as a personal representative. And the probate court has granted her petition for formal probate of the estate of Mrs. Park who is a named plaintiff in this case.

As Mrs. Park's interest in this case is part of the estate, it is, we believe, not only appropriate but incumbent upon the court to allow Seo Kyoung Won to -- whether we call it intervention or substitution -- to be the party plaintiff for Mrs. Park.

THE COURT: Thank you. Mr. Pettit, you have no position; is that right?

MR. PETTIT: That's correct, Your Honor.

THE COURT: Thank you. Mr. McClane.

MR. McCLANE: Your Honor.

THE COURT: And the credit union has no opposition I should put on the record.

MR. McCLANE: Your Honor, I respectfully would like to adjust my no-position position, and this is in view of a couple of items. But one, probably the clearest, and when all else fails look at the applicable rules, Rule 25, it relates to the death of a party. And according to Rule 25, a substitution needs to occur within 90 days of the filing or noting of the death of the party, plaintiff or defendant, on the record of the court.

THE COURT: So there can be no substitution in this case?

MR. McCLANE: That's correct, Your Honor. That's how I read the rule, because it says that if it's not within the 90 days, then the party needs to be dismissed from the case. That's how I read the rule.

THE COURT: Why did you not raise that earlier? Why are you raising that right now, Mr. McClane, for the first time? Explain that to me. You wait until you see what's most beneficial to you minute by minute and then you proceed in

litigation in that manner?

MR. McCLANE: I apologize, that's not generally the way that I proceed at all.

THE COURT: Well, then why are you proceeding that way here? Why should I not find you've waived that argument by waiting until the very last minute to raise it?

MR. McCLANE: Your Honor, because I don't think anybody is particularly prejudiced by it. We have --

THE COURT: Well, then tell me why you waited until now to raise this?

MR. McCLANE: Our general position in this case has been that, as the court has noted in prior hearings, this doesn't really involve Mr. England. We have had optimism throughout that that's a fine position to take and that we should be able to resolve this as reasonable people and let the family dispute continue.

And so that has been our view of this case. And, Your Honor, this week I think I'm changing that view because I don't think that's going to be possible, and I think Mr. England needs to do what is necessary to --

THE COURT: There won't be any plaintiff left in this case almost it appears like under what you want to proceed. So that's why I'm saying you wait until the minute where you see what is most beneficial to you and you change your position as you see fit. Because sister number one, the older sister,

Jasmine, is apparently not participating in this case anymore, from what I can tell.

MR. McCLANE: That's part of the reason why I've changed my position, Your Honor.

THE COURT: Without a substitution, we have essentially no plaintiff. And then, what, your client walks away with all the money, is that how you see it?

MR. McCLANE: My client would like to revive their motion to dismiss.

THE COURT: Well, you'll be able to do that.

MR. McCLANE: I understand. Your Honor, we have participated, corresponded with the other parties, the intervention plaintiff and proposed intervention plaintiff and the plaintiff in good faith, attempted to resolve this case prior to coming out here to Hawaii this time and really didn't think we needed to take a position on this. And I regret that we didn't look at it more aggressively, but I think that Mr. England should be looked at a little bit sympathetically in that view because we --

THE COURT: Why? Why would I do that? What would cause me to do that?

MR. McCLANE: Why should you look at England sympathetically?

THE COURT: What would cause me to do that?

MR. McCLANE: Simply because we've complied with the

court orders, if for no other reason.

THE COURT: Go ahead.

MR. McCLANE: Your Honor, I think that's Rule 25. And I guess I would just mention, just for the court's comfort level, that I believe and I didn't come -- this is truly something as a result of our realizing that the high hopes of the court and the parties to resolve this are rather dashed by Ms. Seo not participating and Ms. Kyoung showing up not prepared to settle, as her lawyer indicated to us yesterday.

And that indicates to me that if this coming together isn't going to settle it, then we need to move on and that's the point. But I want to give the court a comfort level that this is not --

THE COURT: Tell me how the trial is going to proceed exactly without a plaintiff? Tell me how you perceive that? Tell me. You're saying you don't want a plaintiff in this case. You tell me what kind of a trial we're going to have here?

MR. McCLANE: I don't know, Your Honor. I have not gotten that far. I haven't gotten that far. I would like Your Honor to dismiss Mr. England from the case, I'd like Your Honor to recognize what jurisdiction, if any, ought to have this case or no jurisdiction. And --

THE COURT: All right. But if you don't get by all that, if you don't prevail on those arguments?

MR. McCLANE: I don't know the answer to that question.

THE COURT: All right. Proceed.

MR. McCLANE: The comfort level issue, Your Honor, is simply that I don't think Mrs. Park -- and I'm not prepared with evidence, but I'm proffering to the court that I don't think Mrs. Park has ever been a party to this case. The history indicates that she wasn't; that in fact it's been Mrs. Seo. And it's only been Mrs. Seo who has been a party in this case.

I have asked for an engagement letter, when I first spoke to Mr. Pettit, to indicate that he represented Mrs. Park, because it was extraordinary that she would be suing my client under this contract. And he declined and said just please accept service of process in lieu of personal service.

Mr. Rothstein could testify that Ms. Seo, after he received $750,000, went into his bank -- I think it's Bank of Hawaii -- demanded of the president of the bank that he turn over the $750,000 being held by Mr. Rothstein.

When the bank president, unlike the credit union here, declined, Ms. Seo, through her attorneys, threatened Mr. Rothstein with disparagement of his real estate license, if he didn't turn over the $750,000 to him. That does not sound like Mrs. Park. That sounds like Ms. Seo.

Mrs. Park had actually a contract indicating that

Mr. Rothstein was going to buy real estate. We actually told Mr. Rothstein he would be better off sending the money back to where it came from instead of giving it to a third party. He was intimidated into turning over.

THE COURT: Let me ask you on the 90 days. Rule 6B allows an extension with or without motion or notice if the court acts before the original time expires or upon motion made after the time has expired if the party failed to act because of excusable neglect.

Why is there not excusable neglect here, given the testimony of Ms. Seo Kyoung Won that she didn't learn about these events until relatively recently? And it seems like she did act in a relatively short period of time after learning about this matter, if I credit her testimony.

MR. McCLANE: Your Honor, as I read Rule 25, it indicates a must and not a good cause shown. Maybe if you look at it in terms of 6B --

THE COURT: I think there's case law that says 6B applies to Rule 25 --

MR. McCLANE: -- substitution extensions.

THE COURT: We're all looking at my law clerk, and she's on West Law right now, and she's the one that's pulled this up and apparently found a case that says Rule 6B applies to a Rule 25 time period.

MR. McCLANE: Your Honor, we're talking about a death

that occurred in April of 2008. So we are -- right now, more than a year after that death, I think, given the amount of time that would weigh against good cause or reasonableness in terms of --

THE COURT: But she says she first learned of the Hawaii case on February 13, 2009. How could she learn about it before then? She's in Korea.

MR. McCLANE: Well, Your Honor, we all thought she knew about it because we had a sworn power of attorney which turned out to be false.

THE COURT: Right. And you can't blame her for that.

MR. McCLANE: Right. She has not filed a motion for good cause, Your Honor.

THE COURT: Well, I'll see if Mr. Hogan makes such a motion.

MR. McCLANE: Okay. Fair enough. My one other item relating to whether Mrs. Park was a party to this case was that while she was alive, around the same time frame -- this is last year, 14 months ago -- Mr. England had a conversation directly with her. He had not been served --

THE COURT: Is there any evidence of this on the record, or are you just telling me what you know?

MR. McCLANE: I'm just proffering what --

THE COURT: Okay. I'm not going to accept a proffer like that.

MR. McCLANE: Fair enough. Your Honor, that's my point on that. I think that Ms. Kyoung is too late.

THE COURT: Thank you. Mr. Hogan.

MR. HOGAN: Thank you, Your Honor.

First, this is my motion to intervene which is, I think, Rule 24, not Rule 25. I would note, as we all know, on May 21 of 2008, Mr. Pettit's firm filed a suggestion of death. Between May --

THE COURT: When was that?

MR. HOGAN: May 21, 2008. They filed a suggestion of death, within 90 days of the death of Mrs. Park. No party took any action with respect to that suggestion of death. My firm and my client were not aware of this case, and were not involved to know why.

However, from looking at the record and some of the minutes, it appears that for a substantial period of time the parties were working together towards what they thought was going to be a procedural way to dispose of the case, culminating in the motion for partial summary judgment in November which was denied by the court in December.

I don't have any personal involvement or knowledge of what agreements were made between counsel in the period between May and December of 2008. But as far as a motion for intervention is concerned, it is basically without dispute that this case involves an interest relating to property that my

client has an interest relating to the property, which is the subject of this case; namely, the funds on deposit with the court.

For that reason, she is properly entitled to intervene. I think we have created the record that she is the personal representative as best we can create the record, given the circuit court's timeline for procedures. And if required, I don't think we ought to delay it anymore, but we could wait for Judge Hirai to enter her order and letters of appointment. Thank you.

THE COURT: All right. Thank you.

First of all, I want to say that I have -- I want to comment on Exhibits G and H, the purported release waiver and assignment in G and the reported renunciation in H. And based on all the evidence before me, including the credible testimony of Seo Kyoung Won, I find that she did not execute these documents. And I credit her testimony that she did not learn of these matters until very recently as she testified to: one on February 13, '09; and then the second, after Mr. Hogan got involved in the case.

Overall, I do credit her testimony. I believe she was straightforward with the court, appeared credible in the manner in which she answered the questions.

I do note that this motion was brought under Rule 24A, not Rule 25. So I don't know the 90-day limit is critical

here. And I think Mr. Hogan has more than met his burden to show intervention as a matter of right. And I will grant the motion and ask you to prepare the order, Mr. Hogan.

MR. HOGAN: Thank you, Your Honor, I will.

THE COURT: Now, Mr. Pettit, how long does it take you to communicate with your client? I would like to find out if your client intends to further participate in this lawsuit?

MR. PETTIT: Your Honor, I can communicate with her through e-mail, telephone, and regular mail. It is often a time before I get any response back.

THE COURT: So how much time? Two weeks would be enough time?

MR. PETTIT: Yes, Your Honor.

THE COURT: All right. Two weeks from today I want from you some statement as to, A, yes, she does want to participate, and she agrees to, including coming to Hawaii when necessary for settlement conferences and trial and anything else she's ordered to come for; or, no, she's not going to participate, in which case you can file the appropriate paperwork.

If she doesn't respond, you need to let us know that, and I will most likely issue an order to show cause at that point in time.

MR. PETTIT: I understand, Your Honor. Anything else?

THE COURT: No.

MR. PETTIT: Thank you.

THE COURT: Now, Mr. England's motion to dismiss for lack of jurisdiction. I did have you withdraw that for administrative purposes. You can file a one-paged refiling, if you will, of that motion. Okay, so you can just say that you are reinstituting that motion essentially through a one-paged filing.

MR. McCLANE: I will do that.

THE COURT: All right. The credit union is not here, but they have an amended motion to dismiss; they need to do the same. I will put out an EO to make that clear that they must do that.

Now, Mr. Hogan, you want some time to review those motions and see if you have any further opposition or response to those motions?

MR. HOGAN: Yes, I would like that, Your Honor.

THE COURT: All right. So by Monday then I would like statements renewing the previously withdrawn motions. I will then consider the oppositions previously filed and any further opposition filed by June 1 by Mr. Hogan.

If Mr. Hogan files anything substantively, replies would be due on June 8. And then I will determine those motions without a hearing.

MR. HOGAN: Thank you, Your Honor.

THE COURT: I will put out a short EO with those dates

to remind everybody.

MR. HARSTAD: Your Honor, I just have one quick question. In light of the circumstances with Mr. Hogan's clients intervening and our understanding that these assignments were fraudulent, would Mr. England have leave to file a new opposition or an amended opposition to the credit union's papers?

THE COURT: Tell me why that would be relevant? You have to refresh my recollection on the credit union's motion.

MR. HARSTAD: The credit union moved to dismiss on the basis that it basically interpleaded funds and had nothing more to do in this matter. Our position is that the credit union should never have interpleaded the funds in the first place.

THE COURT: I have looked at that, and I don't understand your argument on that in the least. I have to say I'm very confused by your argument on that. I don't know what else the credit union could have done in this circumstance. It's a mystery to me. I remember now that you are talking about that motion, and it seemed to me it was just way out there. I mean, I'll hear your motion. I'll hear your motion.

MR. HARSTAD: Our opposition.

THE COURT: I'm sorry, the opposition. But I just don't see that going anywhere as far as an argument that the credit union should not have interpled these funds.

MR. HARSTAD: Okay, understood, Your Honor. We were

just going on the fly here. I just wanted to --

THE COURT: Well, but why is it that you would need an opportunity to amend or otherwise flush out further your opposition?

MR. HARSTAD: I simply don't know. I just wanted to reserve the right; but if Your Honor sees no need for it, we won't.

THE COURT: Well, look at it, if you think you need to file a motion seeking leave.

MR. HARSTAD: Thank you, Honor.

MR. PETTIT: Your Honor, if I may. I was reflecting on the two weeks. I am leaving Tuesday for the mainland for an extended trip; I'll be back May 30. I would like to have one additional week. I'll get my primary contact with my client.

THE COURT: All right. I'll give you three weeks then. So that would be today --

THE CLERK: June 5, Judge.

THE COURT: June 5.

MR. PETTIT: Thank you, Your Honor.

THE COURT: Is there anything else we need to take up?

MR. McCLANE: Just one item, if I may. Your Honor has recognized for months that there has been fraud committed on the court. You've talked about documents that were powers of attorney that were not really powers of attorney between the parties of this case.

There was a representation by Ms. Seo that Mrs. Park died intestate; she new otherwise. There's a representation by Ms. Seo that she had Ms. Kyoung's power of attorney; she knew otherwise.

There have been orders of this court to participate in settlement that has not occurred. There's an order of this court for all three of the parties, including Mr. England who we contend the court doesn't have jurisdiction over, ordered to appear in Hawaii, and he did. But yet, we have Ms. Seo here having not participated in discovery -- I understand it may not be her lawyer's fault -- I mean presettlement meeting, settlement communications, and completely failing to appear for those settlement communications in spite of the fact that we've come just as far from Florida to do the same thing and the court doesn't have jurisdiction. We didn't file this case like she did.

Ms. Kyoung, for her credibility on the stand today, also appeared without the prospect of settling the case, as her lawyer instructed us at the outset that he was not prepared to settle the case, in spite of our having come 4500 miles to be here pursuant to a court order.

Under the circumstances, Your Honor, I've expressed this before, and I simply want to express it calmly right now, we feel like the court and Mr. England are shanghaied into a family dispute that we shouldn't be and at great expense.

And under the circumstances, with abuse to Mr. England and fraud on the court and contempt in terms of violating court orders, I believe that appropriate sanctions are very appropriate in this case.

THE COURT: Well, your point is not lost on me. I'm not happy as you know overall with the conduct in this case. And it appears to me there has been fraud that has been committed.

What I want to do as a first step is find out whether or not Mr. Pettit's client, Seo Jeong Won, intends to participate any further and then go from there as far as what might happen as a result of that.

MR. McCLANE: Okay. I'm prepared to file a motion with the court, but --

THE COURT: A motion asking for what?

MR. McCLANE: Requesting that the court consider entering sanctions in the form of at least compensating Mr. England for some of his needless expense in the case.

THE COURT: Well, if you want to file a motion, file the motion. I don't know Mr. Hogan, by his facial expression, sort of disagreed, I could tell, with your claim that his client came without some good faith effort to try to settle the case yesterday. My correspondence with Judge Kobayashi suggests there was some headway that was made.

MR. McCLANE: We did make attempts in spite of the

declaration that they were not prepared to settle at the outset. You're right.

THE COURT: All right. So what bothers me more is that Mr. Pettit's client is just off the radar right now. But to be honest with you, I don't know where she is in this case at this point in time. I'm not sure it's relevant to the fact that she did not show up yesterday for settlement. Because I suspect she's done with this case. I suspect we'll never see her again. Period. I don't think she wants to set foot in this court.

MR. McCLANE: I wouldn't either.

THE COURT: So what I would hope the parties could find some way to work things out here is to find out what Mr. England should be compensated -- a fair amount to compensate Mr. England, whatever that might be. And I'm not expressing any opinion on that one way or the other. And then the rest of the money is either decided here is split between the sisters, or whatever the case may be, or it goes to Korea. Interplead it in Korea and let a Korean court deal with it, which is more appropriate than dealing with it here.

And believe me, if I could order that tomorrow, I would do it. Because this dispute, other than Mr. England, does not belong in this court. It belongs in a Korean court.

MR. McCLANE: Your Honor, if I could suggest not on a sanctions level but on the appropriate possible response to the

motion to dismiss is if the court dismisses Mr. England and agrees with our arguments, then I don't believe that -- I think the whole thing cascades because without Mr. England -- without the court having jurisdiction over Mr. England, I think if you look at the statute on the interpleader, I don't think the interpleader is appropriate here either.

THE COURT: Well, I can tell you this. I've looked at your motion carefully. I think my inclination is to believe I have jurisdiction over Mr. England; that's why I've proceeded the way I have so far. If I thought I didn't have jurisdiction, I would have pulled the plug earlier.

Anything else?

MR. McCLANE: No.

THE COURT: Mr. Hogan.

MR. HOGAN: I'm tempted but --

THE COURT: Go ahead if you want.

MR. HOGAN: No, I'm going to resist my New York impulses. I've been here for 30 years. Nothing further.

THE COURT: All right. And once we get through these motions and once we know where Mr. Pettit stands on this matter, I'm going to want to see what potential there is to settle the case along the lines I was discussing. I know you folks have been talking, but maybe once some of these motions are behind us, we'll have some better idea as to where we stand.

We have a trial date as of when is the trial date?

MR. HOGAN: September 22, I believe, Your Honor.

THE COURT: All right. And I'm ordering all of you -- I make it clear to you, do not go to the magistrate judge and ask for a change in that trial date. Don't do it. I'm the only one who's going to change this trial date. And it's going to change under one circumstance, and that is if I have a criminal trial that supersedes it, in which case you will trail.

Okay. So everyone should be prepared to go to trial on September 22. If you have personal plans, change them, because you are going to be here on that date. All right, court in recess.

(Recess at 10:11 a.m. )

COURT REPORTER'S CERTIFICATE

I, Gloria T. Bediamol, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that the foregoing is a full, true, and complete transcript from the record of proceedings in the above-entitled matter.

DATED at Honolulu, Hawaii, May 27, 2009.

/s/ Gloria T. Bediamol
GLORIA T. BEDIAMOL.
RPR, RMR